FILED

2007 Nov-09  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PAT HOLLAND, as Administratrix | ) | |
| of the Estate of ERICA DERAMUS | ) | |
| EARLY, Deceased | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:05-CV-00325-TMP |
| | ) | |
| WALTER KIDDE PORTABLE | ) | |
| EQUIPMENT, INC. and | ) | |
| MAPLE CHASE CO., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER REGARDING MOTIONS TO EXCLUDE TESTIMONY

On June 13, 2007, Walter Kidde Portable Equipment, Inc., *et al.,* filed two Daubert motions to exclude the testimony of plaintiff's experts, Thomas J. Maronick, Don Russell, Vytenis Babrauskas, Joseph Fleming, and Jeff Crain. (Docs. 146 & 148). Defendants assert that the testimony of plaintiff's aforementioned experts is unreliable and/or irrelevant under Daubert. Daubert v. Merrill Dow Pharms., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The plaintiff has filed a response and the matter has been fully briefed. Having carefully considered all of the evidence and argument, the court finds that one of the motions (Doc. 146) is due to be granted, but the second motion (Doc. 148) is due to be denied.

## ADMISSIBILITY OF EXPERT TESTIMONY

"...[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony rest both on a reliable foundation and is relevant to the task at hand.'" Kumho

Tire v. Carmichael, 526 U.S. 137, 141 (1999)(quoting Daubert, 509 U.S. at 596).  "'If scientific, technical, or other specialized expertise will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise.'"  Daubert, 509 U.S. at 588 (quoting Fed. R. Evid. 702).  "The party offering the expert bears the burden of satisfying each element by a preponderance of the evidence." Ferguson v. Bombardier Servs. Corp., No. 05-14781, 2007 U.S. App. LEXIS 17849, at *9 (11th Cir. July 26, 2007)(citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)).

"'Relevant evidence' is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  Daubert, 509 U.S. at 587 (quoting Fed. R. Evid. 401).  Expert testimony must be tied sufficiently to the facts of the case so as to help the jury in resolving the factual dispute.  Id. at 591 (citing United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985).

"...[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence is not only relevant, but reliable.'"  Id. at 589.  "In Daubert, the Supreme Court set out four non-exclusive criteria for reliability determinations: '(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.'  Phillips v. Am. Honda Motor Co., 2007 U.S. App. LEXIS 15917, at *6 (11th Cir. June 3, 2007) (quoting McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004)).  "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  Kumho,, 526 U.S. at 141.  "These factors may guide a

district court's reliability inquiry, but the district court ultimately has 'broad latitude when it decides how to determine reliability.'" Phillips, 2007 U.S. App. LEXIS 15917, at *6 (quoting Kumho, 526 U.S. at 142).   The inquiry is a flexible one concerned with only the scientific principles and methodology, not the "correctness" of the conclusion reached from the methodologies. Daubert, 509 U.S. at 594-95.

## ANALYSIS OF PROPOSED TESTIMONY

### Dr. Thomas J. Maronick

As part of its Rule 26 disclosure, plaintiff turned over Dr. Maronick's preliminary report and allowed him to be deposed on February 23, 2007.  They offer him as an expert in consumer behavior, to testify that an ordinary consumer would not have understood the differences between photoelectric and ionization alarm technologies based on the defendants' packaging of the alarms.  He asserts that ordinary consumers would not understand from the box and labeling of smoke alarms that ionization smoke detectors, such as the one at issue in this case, are slower to detect slow smoldering fires than are photoelectric detectors.   In response to this disclosure, defendants moved to exclude Dr. Maronick's testimony under Daubert, arguing that it simply is irrelevant to any issue in this case.

A review of Dr. Maronick's impressive credentials establishes a basis for qualifying him as an expert witness. (See Maronick Curriculum Vitae).  He has specialized expertise "...by knowledge, skill, experience, training, or education..." Daubert, 509 at 588 (quoting Fed. R. Evid. 702).  This expertise is merely a prerequisite, however, as Daubert requires that proposed expert testimony be both reliable and relevant in regard to the case at hand.  If either requirement is not met, the proposed

testimony is not admissible.   Because this court concludes that Dr. Maronick's testimony is irrelevant, it is unnecessary to examine whether the proffered testimony is reliable.

Dr. Maronick intends to testify that the defendants' packaging and materials accompanying new smoke detectors provide an ordinary consumer with an inadequate warning of the KSA-700's alleged deficiency.   This testimony is irrelevant in the instant case because, as defendants point out, plaintiff never actually read the box, owner's manual, or advertisements for the smoke alarm at issue. (Pat Holland Dep., at 123:8-123:7).   Plaintiff received the smoke alarm as a gift or award.   (Id. at 61:16-62:8).   She did not purchase the smoke alarms as a consumer, nor was she shopping for one when she received the one involved in this case.   She testified affirmatively that she never reviewed either the exterior of the box in which the smoke detector was packaged, nor the materials and owners manual inside.   Because plaintiff never reviewed the packaging of the KSA-700, the adequacy of the warnings on the box or in the owner's manual is irrelevant.   Plaintiff would not have noticed such a warning regardless of whether it was sufficient or not.

"[W]hen an expert's data is not directly relevant to the matter at issue in a case, the expert's testimony does not assist the trier of fact and is therefore inadmissible under Daubert."   Phillips, 2007 U.S. App. LEXIS 15917, at *8.   The adequacy of the warning to Pat Holland as a market consumer is simply not in issue in this case precisely because she failed to review the packaging, owner's manual, and advertisements of the defendant.   She made no purchasing or retention decision based upon the packaging or materials.   This is not a case in which the consumer *did* review the warnings, but was injured as a proximate cause of the inadequacies of the warning.   Because Pat Holland did not rely on any packaging materials or warnings associated with the KSA-700, any alleged inadequacy in the warning cannot be the proximate cause of the injuries sustained here.

4

Therefore, Maronick's testimony does not assist the trier of fact and is inadmissible.  The motion to exclude his testimony is due to be granted.

### Dr. Don Russell

Following plaintiff's Rule 26 disclosure, the defendants moved to exclude Dr. Russell's testimony.  Defendants assail the testimony as both unreliable and irrelevant.  The court finds, however, that Dr. Russell's testimony meets the Daubert gatekeeping requirements, Daubert, 509 U.S. 579, and that defendants' arguments more properly go to the weight of evidence rather than its admissibility.  The weight of Dr. Russell's testimony is the province of the jury, not the court.

Dr. Russell is a supremely qualified expert in the fields of electrical engineering and fire detection technology.  He has served as a professor of electrical engineering at Texas A&M University for over twenty-five years.  (Russell Curriculum Vitae).  He has over ten years of experience conducting extensive testing[1] at the Smoke Detector Test Facility of Texas A&M University.  Id.  Additionally, Dr. Russell has received a plethora of professional accolades.  Id. There can be little question that Dr. Russell is qualified to offer expert evidence on the design, testing, and limitations of smoke detectors.

Defendants first attack Dr. Russell for failing to conduct or locate any study that exactly replicates the conditions of the Holland fire.  Although he concedes his testing may not precisely match the conditions of the Holland fire, he later explains that "[a]bsolute conditions in any given fire are virtually impossible to duplicate."  (Russell Dep., at 108:13-15).  The differences in the

---

[1]  Dr. Russell has performed "...more full scale tests of detectors than any other individual scientist in the United States."  (Plaintiff's Response, at p. 2; Russell Curriculum Vitae).

conditions of the testing and the Holland fire do not necessarily render Russell's data inadmissible. Dr. Russell is not required "...to re-build the Holland residence and recreate the Holland fire..." (Plaintiff's Response, at p. 12). As he pointed out, it would be a "miracle" or "pure stroke of luck" to find "any given test...that everybody would agree is representative of the Holland fire." (Russell Dep., at 108:1-15).

The test under Daubert is not whether the testing conducted by the expert exactly replicate the real-world conditions of the fire at issue, but whether the methodologies used by him are properly grounded in good scientific method and produce test results to allow for accurate conclusions. There is no question that Dr. Russell's experience at the Smoke Detector Test Facility at Texas A&M University is grounded in the scientific method and based upon scientifically reliable testing procedures.

While Dr. Russell did not conduct a test on the KSA-700, he did test other Kidde detectors that had precisely the same sensing component. (Id. at 51:9-23, 52:1-5; 14:4-18) ("...the ionization detector that's made today is virtually identical to the one made 15 years ago."). Further, he testified that the type of material that smoldered is not relevant to analyzing the rate of detection of ionization or photoelectric smoke detectors. (Id. at 43:1-17). Defendants' arguments regarding the differences between Russell's testing and the Holland fire more properly go to the weight of evidence rather than its admissibility. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citing Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)).

Defendants next challenge Dr. Russell's methodology.  Defendants characterize Dr. Russell's opinion that a photoelectric alarm would have sounded "15 to 50 minutes earlier" as a "speculative conclusion."  (Defendants' Memorandum, at p. 14).  While "...a supremely qualified expert cannot waltz into the courtroom and render opinions, [he can offer] opinions [that] are based on some recognized scientific method."  McDowell, 392 F.3d at 1298 (citing Clark v. Takata Corp., 192 F.3d 750, 759 (7th Cir. 1999).  Dr. Russell explained that his opinion is based on his extensive testing of both ionization and photoelectric smoke detectors, which was conducted according to the scientific methodology used by the National Institute of Standards of Technology (NIST) and Underwriters Laboratory (UL).  (Russell Report).  "A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community."  Daubert, 509 U.S. at 594.

Moreover, "...the ability to answer hypothetical questions is the essential difference between expert and lay witnesses."  United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005).  "Trained experts commonly extrapolate [their opinions] from existing data."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).  Defendants merely make the bald assertion that Dr. Russell's opinions are at odds with the "overwhelming and reliable scientific literature" without offering any evidence to prove this contention.  (Defendants' Memorandum, at p. 17).  Plaintiff however offers numerous pieces of scientific literature that show strong support for Dr. Russell's testimony.  (Plaintiff's Response, at p. 15).

Defendants further accuse Dr. Russell of relying on "outlier" data in forming his opinions.  (Defendants' Memorandum, at p. 18).  Defendants' characterization of his reliance on data regarding slow smoldering fires as "outlier" data is misleading at the very least.  Dr. Russell explained in his

deposition that "[t]he average kind of fire doesn't kill people." (Russell Dep., at 112:16-17).  NFPA recognizes that the type of fire people commonly die in usually occurs at night with slow smoldering conditions.  (Id. at 114:10-23).  His testimony relies on tests that deal with "outlier" fires because that is precisely the type of fire that occurred at plaintiff's home.  Id.  He should not be barred from testifying because he examined data that is relevant to the instant case.

Finally, defendants argue that the proffered testimony should be barred because Dr. Russell's data concerns only relative performance and not the absolute performance of the smoke alarms in question.  This argument ignores the impossibility of stating precisely when the smoke alarm would have gone off.  According to Dr. Russell, "[n]obody is going to know the explicit answer with respect to timing, because we don't know the development of the smoldering fire." (Id. at 60:6-10).  Russell testified that he could establish a range of time for when the photoelectric alarm would sound compared to the ionization alarm in question.  (Id. at 59:5-13) (That time range "...would, in this case, be anywhere from 15 to 50 minutes earlier than the ionization detector would have gone off.").  The inability of an expert to state which absolute certainty when an event happened does not render that expert's testimony irrelevant.  Rather, the court must look at the expert's testing and opinions derived therefrom and determine whether those opinions will assist the trier of fact to determine a fact at issue.  See Fed. R. Evid. 702.  As plaintiff correctly points out, the relative performance of the two different types of detectors is an essential issue in this case.  Dr. Russell's testimony will assist the jury by explaining the differences in processing and response time between the two types of smoke alarm technologies.  This court finds the testimony of Dr. Russell both relevant and reliable.  Therefore, Dr. Russell's testimony is admissible, and the motion to exclude his testimony is due to be denied.

### Dr. Vytenis Babrauskas

Defendants argue that Dr. Babrauskas's opinions are unsubstantiated and unreliable, and that he fails to offer any relevant testimony about the performance of the KSA-700 at issue in the instant case. Defendants' arguments are unavailing because Dr. Babrauskas's opinions are based on peer-reviewed scientific literature, his extensive experience, and the specific facts of the instant case. (See Babrauskas Report). Furthermore, defendants' arguments that Babrauskas should have performed certain tests or modeling and should have taken other factors into account more properly goes to the weight of the evidence. Defendants will have the opportunity to cross-examine and present contrary evidence on this issue.

Dr. Babrauskas is a highly qualified fire safety expert with over thirty-five years of experience in the field. (Babrauskas Curriculum Vitae). He has published more than two hundred and fifty papers or reports in the field of fire safety. Id. He is a Fellow in the Society of Fire Protection Engineers, and has received their highest honor, the Guise Medal. Id. Moreover, he has testified in nine civil actions, as well as given numerous depositions. Id. Dr. Babrauskas has the predicate "...knowledge, skill, experience, training, or education..." to offer the opinions presented in this case. Fed. R. Evid. 702.

Specifically, defendants attack three related opinions regarding ionization technology and the Holland fire: (1) that photoelectric alarms offer a significant advantage in smoldering fires; (2) that the KSA-700 failed to timely warn the decedents which ultimately prevented them from evacuating; and (3) that a photoelectric alarm would have provided sufficient warning for the occupants to escape. (Defendants' Memorandum, at p. 20). Defendants categorize these conclusions as impermissible *ipse dixit* opinions. This assertion is not in agreement with the facts.

First, Dr. Babrauskas concluded that photoelectric alarms offer a significant advantage in smoldering fires over ionization alarms based on his analysis of peer-reviewed scientific literature, and case materials.  (Babrauskas Report, at p. 2).  Analysis of scientific studies is a commonly accepted basis for expert opinions.  See Kumho, 526 U.S. at 141.  Dr. Babrauskas has identified several scientific studies that support his conclusions, including studies performed by the National Institute of Standards of Technology (NIST).    (Id. at p. 1-5); Compare McCool v. Bridgestone/Firestone N. Am. Tire, Inc., 222 Fed. Appx. 847, 849 (11th Cir. 2007) ("Nor did the report identify any scientific studies, industry testing or peer-reviewed articles to support [the expert's] opinion.").  He specifically explains the findings of several studies that form the basis of his opinion. (Babrauskas Report, at p. 1-5).  Further, defendants have not refuted his assertion that no experimental studies show "...that ionization detectors are as good, or better, than photoelectric detectors for detecting smoldering fires." (Plaintiff's Response, at p. 12).  Defendants merely claim that government studies have concluded that ionization alarms provide adequate protection. (Defendants' Memorandum, at p. 22).

Second, Dr. Babrauskas logically concludes, based on the physical evidence of the Holland fire, that the KSA-700 failed to timely warn the decedents and ultimately prevented them from evacuating.  Dr. Babrauskas bases this opinion on the reports of the State Fire Marshal and Jeff Crain, as well as the depositions of the fire fighters who responded to the Holland fire.  (Babrauskas Report, p. 1-5).  He explains that because all three decedents were found in identical posture next to their beds the reasonable inference is that the smoke alarm sounded just prior to their incapacitation. (Babrauskas Dep., p. at 133:11-139:2).  The fact that all three of the victims awoke suggests that it was the alarm and not "a crackling sound" that woke them.  Id.  The noise would

have to be loud enough to wake three people in different parts of the house with closed doors between them.  Id.

He further explains that when the decedents woke up they got out of their beds and were incapacitated when they stood up and encountered high levels of toxic gas that had accumulated at the ceiling.  Id.  "...[A]mongst fire science professionals [this phenomena] is widely known."  (Id. at 137:9-11).  This opinion is based on his experience with other fires and the victims of those fires.  (Babrauskas Dep., at 138:4-20).  If no alarm had sounded, most likely the decedents would have been found lying in their beds instead of on the floor.  Id.

This opinion appears to be well-founded as it is the only logical explanation based on the facts of the instant case.  The only other explanations are that either: (1) the decedents were awakened by the alarm, were not incapacitated, and chose to stay next to their beds instead of trying to evacuate, or (2) that no alarm sounded and all three of the victims awoke simultaneously and were incapacitated.  The fact that Dr. Babrauskas refuses to speculate on the exact time the decedents became incapacitated does not render his opinions on incapacitation invalid.  (Babrauskas Dep., at 108:20-109:23).  Whether the alarm warned the decedents in a timely manner that would have allowed them to escape is the relevant issue, and Dr. Babrauskas's testimony could aid jurors in reaching a conclusion about the timing of the alarm in relation to the time necessary for the decedents to escape.

Third, Dr. Babrauskas's opinion that a photoelectric alarm in the place of the KSA-700 would have provided a warning between 15 minutes to one hour earlier, and therefore the decedents would have had time to escape, is based on the peer-reviewed scientific literature.  (Plaintiff's Response, at p. 13).  In fact, Dr. Babrauskas specifically identifies a study that indicates "...if 13

minutes are subtracted from the point in time at which a fire is serious or life-threatening, then conditions are more likely than not to be [non-life-threatening] at such an earlier stage." (Id. at 14). This opinion relies entirely on scientific valid methodology, i.e. peer-reviewed scientific literature. Therefore, this court concludes that Dr. Babrauskas meets the requirements of Daubert. Daubert, 509 U.S. 579. Accordingly, the motion to exclude his testimony is due to be denied.

### Joseph Fleming

Defendants argue that the opinions of Joseph Fleming are inadmissible as unreliable and irrelevant. (Defendants' Memorandum, at p. 23). This court finds that the opinions of Chief Fleming go directly to a central issue in this case and are based on scientifically valid methodology. Defendants' arguments regarding the reliability of Chief Fleming's opinions concern the weight of evidence rather than its admissibility.

Chief Fleming is a fire protection engineer who currently is serving as a Deputy Chief with the Boston Fire Department and is responsible for six districts, twenty-eight fire companies, and 300,000 people. (Fleming Curriculum Vitae). During his twenty-nine years as a fire fighter, Chief Fleming has inspected fire prevention systems and investigated hundreds of fires. For seven years of his service, he served as fire marshal where he investigated several fatal fires each year. Id.

Defendants erroneously assert that "Fleming has made no effort whatsoever to tie his opinions to the facts or circumstances of this case..." (Defendants' Memorandum, at p. 24). Chief Fleming's opinions are tied to the facts of this case by his knowledge of the adequacy of ionization smoke detectors and their detection of slow smoldering fires. Expert opinions are not required to relate to every single fact in a case, rather the opinion must be tied to those facts relating to the issue

for with the opinion is given.  See Daubert, 509 U.S. at 591 ("...knowledge about whether a certain night was dark...if darkness is in fact an issue...will assist the trier of fact.").  Clearly, Chief Fleming's opinions are relevant to the issues of whether "...ionization smoke detectors are inadequate with respect to their detection of slow smoldering fires and [whether] the defendants' have known this for years...," as the plaintiff points out.  (Plaintiff's Response, at p. 13).  The relative capabilities of ionization smoke detectors in slow smoldering fires is relevant to the issue of whether they are "defective" or "unreasonably dangerous," given the common scenario of slow smoldering fires bing the cause of fatal fires in homes.

Finally, defendants' argue that Chief Fleming's opinions are unreliable because: (1) he did not make an analysis of the smoke migration, (2) he did not speculate as to when either type of alarm (ionization or photoelectric) would have sounded in this fire, (3) he does not offer an opinion about what the occupants were doing when the fire began, and (4) his opinions are contrary to government-sponsored research.  (Defendants' Memorandum, p. at 24-26).  Defendants also attack Chief Fleming's characterizations that the benefits of ionization detection are "negligible" and that smoldering fires are "more dangerous" than fast flaming fires.  (Id. at 26).  All of these arguments go to the weight of the evidence rather than admissibility.

Defendants fail to attack Chief Fleming's "knowledge, skill, experience, training, or education".  Fed. R. Evid. 702.  Instead, defendants merely dispute the resulting conclusions.  Chief Fleming's opinions are based on his review of the reports, statements, depositions, and photographs taken by investigators of the Holland fire.  (Fleming's Report, p. 1-3).  Further his opinions regarding ionization technology and defendants' knowledge of that technology come from published scientific studies and his experience as a fire protection engineer.  (Id. at p. 3-10).  The published studies Chief

Fleming relies on to form his opinions were generated by National Fire Protection Association (NFPA), Underwriter's Laboratories (UL), National Institutes of Standards and Technology (NIST), the International Association of Fire Chiefs, and various fire departments.  Id.  Chief Fleming's report has "...explicit[ly] identifi[ed] [the] relevant scientific community and...acceptance within that community."  Daubert, 509 U.S. at 594.  Therefore, this court finds that Chief Fleming's opinions meet the requirements of Daubert.  Accordingly, the motion to exclude his testimony is due to be denied.

### Jeffrey Crain

Defendants' contend that Mr. Crain's opinions regarding the comparative abilities of smoke alarm technologies and the duration of the smoldering phase of the fire should be barred because they are unreliable.  (Defendants' Memorandum, at p. 27-32).  The court addresses each of these contentions in turn.

Mr. Crain is a certified fire investigator who has performed between 2,000 and 3,000 cause and origin fire investigations.  (Crain Curriculum Vitae).  He has been certified by the State of Alabama, the International Association of Arson Investigators, and the National Association of Fire Investigators.  Id.  He has earned a bachelor's degree in electrical engineering as well as an associate's degree in fire science.  Further, Mr. Crain has worked as a fire investigator since 1991 and has attended numerous professional training courses.  (Id. at p. 1-3).

Defendants' contention that Mr. Crain is not qualified to give expert testimony regarding the comparative smoke alarm technologies has merit.  Plaintiff seeks to offer his testimony that there is a "substantial difference in response times between the ionization type smoke detector and the

14

photoelectric type detector with regards to a slow smoldering type fire." (Crain Report, at p. 3-4). He claims there "recognized difference in the field of fire investigation." (Crain Dep., at 53:6-8). This is despite the fact that he admits that he is not an "expert on the performance of the different types of smoke detectors". (Id. at 53:2-8). Further, Mr. Crain bases this opinion on "things [he's] heard from people, and things [he's] read", but he is unable point to any study or professional manual that establishes this "general understanding". (Id. at 56:7-58:1). "...[T]he word 'knowledge' connotes something more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Therefore, because Mr. Crain has not conducted testing or cited any scientific studies which would provide a basis for his opinions regarding the comparative smoke alarm technologies, this court finds such an opinion inadmissible.

The court also notes that the proffered opinion appears cumulative of the testimony of plaintiff's other experts. While there may be a general knowledge of the differences in smoke alarm technologies, Mr. Crain's knowledge is insufficient to classify him as an expert in that area. Plaintiff's other experts, however, are qualified to testify on the different technologies. Mr. Crain's opinion would be cumulative and unnecessary.

The Defendants' other contention is that Mr. Crain's opinion regarding the existence or duration of the smoldering phase of the Holland fire is unsubstantiated and speculative. (Defendants' Memorandum, at p. 30). The court concludes that this contention is without merit. If Defendants' contention was accepted nearly all technical or specialized knowledge would be barred as speculative. In determining whether an expert is qualified to give an opinion, "[t]he key consideration is whether the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Rider v. Sandoz Pharm. Corp., 295

F.3d 1194, 1197 (11th Cir. 2002)(quoting <u>Kumho</u>, 526 U.S. at 156).  Mr. Crain has followed the standard methods of fire investigation by adhering to NFPA 921.  (Crain Report).  "The National Fire Protection Association 921 Guide for Fire and Explosion Investigation (NFPA 921) is a recognized guide for assessing the reliability of fire investigations."  <u>Turner v. Liberty Mutual Fire Insurance Co.</u>, No. 4:07-CV-00153, 2007 U.S. Dist. LEXIS 68555, at *9 (N.D. Ohio, Sept. 14, 2007); <u>See also</u> <u>Independent Insurance. Co.  v. Gen. Elec. Co.</u>, 326 F. Supp. 2d 844, 849 (N.D. Ohio, 2004).  Further, "the principles of NFPA 921 [are] a peer reviewed and generally accepted standard in the fire investigation community."  <u>Travelers Property & Casualty Corp. v. General Electric Co.</u>, 150 F. Supp. 2d 360, 366 (D. Conn., 2001); <u>See also</u> <u>Gaskin v. Sharp Electric Corp.</u>, No. 2:05-CV-303, 2007 U.S. Dist. LEXIS 65532, at *13-14 (N.D. Ind., Aug. 31, 2007); <u>United States v. Wolf</u>, No. 99-30095, 1999 U.S. Dist. LEXIS 20736, at *12-13 (D.S.D., Dec. 6, 1999).

Defendants' argue that Mr. Crain's assessment of burn patterns are "subjective" and that he has failed to conduct any "testing or analysis to support his opinion." (Defendants' Memorandum, at p. 31).  "In this case, the court is unsure what type of physical testing, if any, [the fire investigator], a cause and origin expert, could have conducted."  <u>Gaskin</u>, 2007 U.S. Dist. LEXIS 65532, at *17. Determining the smoldering phase of the fire, as Mr. Crain "...has done, is not susceptible to testing, and yet, it does constitute generally accepted practice as a method of fire investigators..."  <u>Id.</u>  Mr. Crain's opinion regarding the smoldering phase is well within his area of expertise as a certified fire investigator.

Finally, the court's reasoning is best stated as follows:

"The court finds no basis for the exclusion of [the expert's] testimony....  He has performed many investigations over a long

16

career.... He has extensive professional and vocational training in the
subject area.... There is no evidence that [the expert] has applied an
unusual approach in his investigation; his investigation appears to
follow standard fire investigation practices....  A review of [the
expert's] report reveals no significant gaps in deductions, nor any
basis for viewing his conclusions as so unreliable or irrelevant as to
justify exclusion."

George v. Ronco Inventions, LLC., No. 02-1436-JTM, 2004 U.S. Dist. LEXIS 4573, at *7-8 (D.

Kan., Mar. 2, 2004).  Therefore, this court finds that Crain's testimony regarding the smoldering

phase of the fire is admissible.  The motion to exclude his testimony is due to be granted in part and

denied in part.  Although Mr. Crain will be allowed to testify about the smoldering phase of the fire,

he will not be allowed to express any opinion about the relative capabilities of ionization detectors

and photoelectric detectors.


## CONCLUSION

Based on the foregoing discussion of the evidence and arguments presented by the parties,

the court finds that the motions to exclude are due to be resolved as follows:

The motion as to Maronick, (court doc. # 146), is due to be and hereby is GRANTED.  The

motion as to Russell, Babrauskas, Fleming, and Crain, (court doc. # 148), is due to be and hereby

is GRANTED IN PART and DENIED IN PART, as discussed in detail herein above.

DATED this 9th day of November, 2007.


T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

17