FILED

2007 Nov-28  AM 11:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PAT HOLLAND, as Administratrix, etc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:05-cv-325-TMP |
| | ) | |
| | ) | |
| WALTER KIDDE PORTABLE | ) | |
| EQUIPMENT, INC.; MAPLE CHASE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed by defendants Walter Kidde Portable Equipment, Inc., ("Kidde") and Maple Chase Company ("MCC") on June 29, 2007 (Doc. 156).  Plaintiff filed her response to the motion on July 30, 2007 (Doc. 174).  The motion has been thoroughly briefed and is now under submission.

Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence

2

and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

Undisputed Facts

For purposes of the defendants' motion for summary judgment, the following facts are taken in a light most favorable to the non-moving plaintiff.

In 1994, MCC manufactured an ionization chamber smoke detector under the model number KSA-700. It was sold and marketed through Kidde. The known state-of-the-art in the smoke-detector industry at the time was that ionization smoke detectors work best in detecting fast flaming fires, but work more slowly in detecting slow smoldering fires. It was known that slow smoldering fires are detected more quickly by photoelectric smoke detectors. This difference arises from the different ways the two types of detectors work and the size of smoke particles being produced by the fire. Fast flaming fires produce small smoke particles, sometimes called "invisible smoke," not easily detected by a photoelectric detector, but readily detected by the ionization-chamber detector because of the molecular changes, or ionization, that occurs in the presence of a flaming fire. Slow smoldering fires, by contrast, produce large smoke particles, creating a dense smoke cloud, easily detected by a photoelectric detector which works because the large smoke particles entering the detection chamber more readily scatter the light used as the trigger for the detector. A slow smoldering fire produces fewer ions, at least until it erupts into a flaming fire, and thus is slower to trigger an ionization detector.

Although the front of the box in which the KSA-700 was distributed promised "complete smoke and fire response," the owner's manual inside the box contained the following statement:

> ALL TYPES OF SMOKE ALARMS HAVE LIMITATIONS. NO TYPE OF SMOKE ALARM CAN SENSE EVERY KIND OF FIRE AND SMOKE EVERY TIME. Ionization Smoke Alarms (such as this unit) are your best overall choice for reliability and fast response time (NFP Research Foundation and U.S. Fire Administration Data) since they quickly sense small "invisible" smoke particles and also sense large "visible" smoke particles; Note photoelectric smoke alarms may respond faster in certain types of fires, for example slow smoldering fires with large "visible" smoke particles.

At least as early as the late 1980s, some smoke detector manufacturers offered a dual or "combo" smoke detector that combined the smoke-detecting characteristics of both technologies. These detectors, however, were generally more expensive than either an ionization or photoelectric detector alone.  Ionization detectors were priced mostly below $10, photoelectric detectors were priced less than $15, and "combo" detectors were generally priced less than $30.

In 2000, plaintiff Pat Holland received a KSA-700 smoke detector from her employer as a gift or award.  At the time, she already had three or four other smoke alarms installed in her home, and she was not shopping for or in the market for another smoke alarm.  When she received the gift KSA-700, she did not read the outside of the box, nor did she read the owner's manual in the box. There is no evidence that her daughter, the deceased, Erica DeRamus Early, read either the box or owner's manual at any time after Pat Holland received the smoke alarm as a gift.  Most likely, the box and owner's manual were discarded not long after the smoke detector was installed in plaintiff's home.

During the middle of the night on April 9, 2004, a fire occurred at Pat Holland's home, where the decedent, Erica Early, was asleep and the KSA-700 smoke alarm was installed.  Erica Early was asleep in an upstairs bedroom with her husband, and the KSA-700 was installed in the hallway just outside the bedroom.  The fire originated in a chair in the downstairs living room, probably as the result of a cigarette or other smoking material being dropped accidentally into the cotton fabric and batting of the chair.  It was a slow smoldering fire that smoked for a period of time before it erupted into open flames.  Plaintiff's experts, by examining the small extent of damage caused by the fire, the burn pattern from the chair to the nearby wall, and the amount of soot accumulation and smoke damage in the second floor bedrooms, have estimated that the fire may have smoldered for 45

minutes to an hour and a half before erupting into open flames.  When the firefighters arrived at the home, all of the smoke alarms, including the subject KSA-700, were sounding alarms.  Although the fire was quickly extinguished and did little damage to the house, Erica Early and two other occupants of the home were found dead in two bedrooms, overcome by smoke inhalation.  There was no fire damage in the rooms in which they were located, and there was no fire injury (burning or singeing) to any of the deceased.  The medical examiner has determined that Erica Early's cause of death was smoke inhalation.

Erica's body was found on the floor, not in the bed, suggesting that she was aroused from sleep and got out of bed before she was overcome with smoke.  The extent of soot accumulation in the bedroom in which she was located shows that the room was filled with a large amount of dense smoke that had traveled from the smoldering chair, up the stairs, and through the hallway to the room where she was located.  Indeed, the soot accumulation was such that Erica's body left a silhouette when it was moved.  The floor underneath her body was clean, but the floor around her was heavily stained with soot.

Consistent with the generally recognized fact that photoelectric smoke alarms detect smoldering fires more quickly than ionization smoke alarms, testing of comparable units by plaintiff's expert, Dr. Russell, indicates that a photoelectric smoke alarm will sound 15 minutes to 50 minutes sooner than an ionization alarm in the same density or obscuration level of smoke. Consistent with this testing, he offers the opinion that a photoelectric alarm would have sounded 15 to 50 minutes sooner under the circumstances of the smoldering fire in this case than did the KSA-700. According to a report by a special subcommittee of the International Association of Fire Chiefs,

photoelectric smoke detectors alarm at between 2% and 4% smoke obscuration levels,[1] but ionization detectors may not sound even at 10% to 25% levels.

Discussion

The defendants' motion for summary judgment seeks dismissal of Counts One and Two of the plaintiff's Amended Complaint, filed January 16, 2007.  Count One of the Amended Complaint alleges a claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), asserting that the KSA-700 was unreasonably dangerous due to its basic design as an ionization smoke detector.  Count Two alleges a claim under Alabama common law negligence, essentially asserting that the defendants negligently designed, manufactured, and marketed the KSA-700 as an ionization smoke detector while being aware that it would not detect smoldering fires as quickly as other smoke-detection technologies.  Defendants argue that plaintiff cannot meet her burden of proving, under Count One, that the KSA-700 was defective and unreasonably dangerous, and under both counts, that the KSA-700 proximately caused the death of Erica Early.  On this latter point specifically, they assert that there is no evidence of when the KSA-700 alarmed in relation to the duration of the smoldering fire, and without proof that the KSA-700 failed to alarm in a timely fashion, plaintiff cannot show that the alleged failure to alarm as quickly as a photoelectric smoke detector actually caused Erica Early's death.  The court finds there there are genuine issues of

_____

[1]  Smoke obscuration levels measure the percentage of smoke particles obscuring visibility in a certain volume of air.  See Residential Smoke Alarm Report, International Association of Fire Chiefs (1980), at http://www.worldfiresafetyfoundation.org/pdfs/ResidentialSmokeAlarmReport.pdf. National Fire Protection Association Standard #74 sets 4% as the obscuration level at which a smoke detector should sound.

material fact that preclude summary judgment and that defendants are not entitled to judgment as a matter of law.


I.  AEMLD

Plaintiff's first theory rests on the AEMLD.  The Alabama Extended Manufacturer's Liability Doctrine holds that manufacturers and suppliers of goods are liable for injuries caused by their products if, at the time they leave the control of the supplier, the product is defective and unreasonably dangerous.  The essential elements of the claim are well known.  To establish liability under an AEMLD theory, the following elements must be established:

> "'To establish liability, a plaintiff must show:
>
>> "'(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
>>
>>> "'(a) the seller is engaged in the business of selling such a product, and
>>>
>>> "'(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it [was] sold.'"

Kirk v. Garrett Ford Tractor, Inc., 650 So. 2d 865, 866 (Ala., 1994) (quoting Casrell v. Altec Industries, Inc., 335 So. 2d 128, 132-33 (Ala., 1976)); see also Tanksley v. ProSoft Automation, Inc., ___ So. 2d ___, 2007 WL 1576113 (Ala., 2007).  It is not disputed that defendants are "sellers" of the product at issue, or that the KSA-700 reached the plaintiff in a substantially unaltered condition. The question here is whether a reasonable jury could find that the KSA-700 was "defective" and

"unreasonably dangerous" because it was an ionization detector that may not detect smoldering fires as quickly as other available technologies.

Under AEMLD, Alabama law defines a "defective" product as one that is "unreasonably dangerous for its intended use." Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 470 (11th Cir. 1993) (citing Casrell v. Altec Industries, Inc., 335 So. 2d 128, 132-33 (Ala., 1976)). As the Alabama Supreme Court has commented:

> [B]ecause the AEMLD is a fault-based cause of action, the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition. ... The terms "defect" and "defective," as applied under the AEMLD, have been defined as follows:
>
>> "[A] 'defect' is that which renders a product 'unreasonably dangerous,' i.e., not fit for its intended purpose ....
>>
>> " ....
>>
>> "'Defective' is interpreted to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety. Comment g. of the Restatement [Second of Torts (1965) ] says defective condition applies when, at the time the product leaves the seller's hands, it is in a condition not contemplated by the ultimate consumer."

Casrell v. Altec Industries, Inc., 335 So.2d 128, 133 (Ala., 1976).

Jordan v. General Motors Corp., 581 So. 2d 835, 836-837 (Ala., 1991). The question whether a product "does not meet the reasonable expectations of an ordinary consumer as to its safety," almost always is viewed as an issue to be decided by the trier of fact, the jury. Gean v. Cling Surface Co., 971 F.2d 642, 644 (11th Cir. 1992); Outlaw v. Firestone Tire & Rubber Co., 770 F.2d 1012, 1014 (11th Cir. 1985). "The question of '[w]hether a product is "unreasonably dangerous" is for the trier of fact.'" Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 470 (11th Cir. 1993) (citing Casrell

9

v. Altec Industries, Inc., 335 So. 2d 128, 132-33 (Ala., 1976)).  It does not matter whether the alleged

defect is in the design of the product or exists due to a manufacturing error.  Id.

 The same result obtains in this case.  Plaintiff has presented evidence that the KSA-700 was

an ionization smoke detector, and that it was well known by defendants, as well as within the fire

safety and protection industry, that ionization smoke detectors did not and do not detect large-

particle, smoldering fires as quickly as photoelectric smoke detectors or combination detectors that

incorporate photoelectric technology.  A number of authoritative fire-safety organizations and

authorities have criticized ionization smoke detectors for failing to timely detect smoldering fires that

produce large amounts of dense smoke because these fires occur frequently at night when a timely

alarm is crucial to arousing residential occupants in time to escape.  It is certainly true that ionization

smoke detectors frequently serve a valuable role in alerting residential occupants to the presence of

fast flaming fires, and, indeed, such detectors have saved lives.  There also is evidence, however, that

most purchasers and consumers are unaware of the different types of smoke alarms and the

limitations inherent in ionization detectors.  Whether ionization detectors are "fit" for the intended

purpose of detecting residential fires, particularly smokey fires, and therefore "meets the reasonable

expectations of the consumer as to its safety," is a jury question.

 Although decided under Iowa strict liability law, the case of Mercer v Pittway Corporation,

616 N.W.2d 602 (Iowa, 2000), is sufficiently comparable to the instant case to lend some insights.

There, one child was killed and one injured by a fire that erupted in their bedroom after a baby

monitor malfunctioned.  Despite the presence of dense black smoke, an ionization smoke detector

did not sound an alarm until after the conditions "became untenable."  Commenting on Iowa's strict

liability standard, the Iowa Supreme Court noted that the plaintiff was required to prove that the

smoke alarm contained a "defective condition unreasonably dangerous," such that "the defect in the product was not one contemplated by the consumer." Id. at 619. The court went on to note that whether the utility of the product outweighs its inherent dangerousness, so that it is not "unreasonably" dangerous, is a question for the jury.

Although Mercer is not Alabama authority, it demonstrates that the design of an ionization smoke detector cannot be determined to be safe as a matter of law. Perhaps it is not unreasonably dangerous, given its usefulness in other fire circumstances, but the court cannot make that determination as a matter of law. The plaintiff has the right to have a jury assess whether, given its design limitations, an ionization detector like the KSA-700 is unreasonably dangerous because it does not meet the reasonable expectations of consumers with respect to *all* types of fires.

The essential purpose of a smoke detector is to detect and sound an alarm in sufficient time to enable the occupants of a building to escape. Indeed, it is plainly foreseeable that smoke detectors must be able to rouse sleeping occupants in time to escape nighttime fires. Because there is substantial evidence from which a reasonable jury could conclude that ionization smoke detectors are not fit for the intended purpose of providing a timely alarm in the presence of a commonly occurring fire, defendants are not entitled to judgment as a matter of law. That ionization smoke detectors detect *some* fires as quickly as other technology does not mean, *as a matter of law*, that they are not unreasonably dangerous, given the evidence from the plaintiff's perspective that ionization detectors may not sound an alarm in the presence of smoldering fires soon enough to enable residential occupants to escape being overcome by smoke and carbon monoxide. It would be possible for a reasonable jury to find that such smoke detectors are not fit for their intended

purpose of detecting smoke and sounding a timely alarm, and thus are unreasonably dangerous. Defendants are not entitled to judgment as a matter of law on this point.[2]


II. Proximate Cause

Defendants also assert that they are entitled to summary judgment because the undisputed evidence fails to establish that any defect in the KSA-700 was the proximate cause of the death of Erica Early.  They point out that no one can state with any certainty how long the fire smoldered before the smoke alarm sounded, or that when it sounded, there was not adequate time for Erica Early to escape the smoke filling her bedroom.  In light of this, they argue, plaintiff cannot establish that a photoelectric smoke detector would have sounded more quickly or provided more escape time than did the KSA-700 in this case, and, absent proof of that fact, it cannot be said that any alleged defect in the ionization detector proximately caused the death.

First, there can be no question that "'delay' in an emergency situation can give rise to proximate cause." Dillard v Pittway Corporation, 719 So. 2d 185, 193 (Ala., 1998).  If, in fact, the evidence would authorize a reasonable jury to conclude that the KSA-700 at issue here failed to detect smoke and delayed sounding an alarm until there was no longer any escape time left, that failure and delay would be a proximate cause of the death.  The question is whether, viewing the facts and inferences favorably to the plaintiff, such substantial evidence exists from which a reasonable jury could find that the KSA-700 failed to sound a timely alarm.

_____

[2]  The court notes that the same reasoning precludes summary judgment with respect to plaintiff's common law negligence theory as well.  If, in fact, the ionization design of the KSA-700 makes it unable to detect smokey, smoldering fires in adequate time for building occupants to escape a heavily smoking fire, a jury could find that the defendants were negligent in designing and marketing it.

The plaintiff's evidence shows that the fire in the downstairs chair smoldered for 45 to 90 minutes before erupting into an open flame.  This estimate is based on the large amount of soot and smoke damage found in the upstairs rooms compared to the relatively small amount of fire damage to the area around the chair.  The great amount of soot accumulation upstairs suggests that the chair smoldered, producing dense smoke, for a relatively long period of time before it erupted into an open flame.  The modest fire damage around the chair indicates that the flaming phase of the fire was relatively short.  Likewise, the large amount of soot accumulation upstairs indicates that a great deal of smoke was produced and found its way upstairs to the hallway where the KSA-700 was installed outside the bedroom where Erica Early and her husband slept.  A jury also could conclude that, because Erica's body was found on the floor, she was roused by something (either the alarm or the smoke itself), but was almost immediately overcome by the smoke.  The fact that all three occupants of the upstairs bedrooms were killed — not one escaped — could support an inference that the alarm sounded only after conditions were no longer tenable.  All three were overcome by smoke and carbon monoxide, indicating the reasonable possibility that they were not roused by an alarm until it was too late to escape.  Put another way, it would not be unreasonable to believe that, if the alarm had sounded earlier, while there was still time to escape, at least one of the occupants would have managed to do so.[3]  The fact that they did not could support a finding that the alarm came too late to save them.

_____

[3] The court recognizes that the defendants argue that the occupants may not have been roused due to their own use of drugs.  But this only raises a fact issue for the jury to consider whether the drugs used were of the type and amount that would have affected the decedents' ability to be awakened.  The court cannot say as a matter of law that they failed to awake because they ingested drugs, or because there was no alarm sounding to awaken them.  The amount of drugs found in Erica Early's body was relatively small, yet she, too, apparently was not roused until it was too late to escape.

13

These circumstances fit with the generally accepted fact that ionization smoke detectors do not detect smokey, smoldering fires as quickly as photoelectric detectors.  Plaintiff's expert, Dr. Russell, has testified that, based on his testing of both ionization and photoelectric smoke detectors at his Texas A&M laboratory, photoelectric smoke detectors sound alarms in smokey conditions 15 to 50 minutes sooner on average than ionization detectors.  Several other expert witnesses confirm that photoelectric detectors respond more quickly to smokey, smoldering fires than do ionization detectors.  This fact, if accepted by the jury, supports an inference that the ionization design of the KSA-700 caused it to react more slowly to the smoldering fire at the plaintiff's home, helping to explain the apparently late alarm in this case.  A reasonable jury could find on this evidence that a photoelectric smoke detector would have sounded substantially sooner (15 to 50 minutes sooner), providing Erica Early and the other occupants ample time to escape the lethal, choking smoke.

The court finds that there is substantial evidence authorizing a jury to find that the KSA-700 at issue here failed to sound a timely alarm until very late in the fire, and that such delay proximately caused the death of Erica Early.  Had the alarm sounded 15 to 50 minutes earlier in the smokey hallway, there is every reason to believe that Erica Early would have escaped and sought help.  There is sufficient evidence to preclude summary judgment and to submit the proximate cause issue to the jury.

Conclusion

Based on the foregoing law and factual considerations, the court cannot say that there is no substantial evidence that the KSA-700 smoke alarm involved here was not unreasonably dangerous

or that its inherent limitations as an ionization smoke detector was not the proximate cause of the death.  There are genuine disputes of fact that preclude summary judgment.  By separate order, the court will deny the defendants' motion for summary judgment.

DATED this 28th day of November, 2007.


T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE